IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 6, 2003 Session

## STATE OF TENNESSEE v. GERALDRICK JONES

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-13085     Chris Craft, Judge**

---

**No. W2002-00747-CCA-R3-CD  - Filed October 17, 2003**

---

This direct appeal of right for first degree murder for which the defendant received a sentence of life without parole raises five issues of alleged error: (1) sufficiency of evidence; (2) failure to suppress the defendant's statements; (3) improper admission of photographs; (4) improper testimony of experts at the penalty phase of trial; and (5) improper admission of evidence concerning a prior conviction of the defendant. We conclude that the evidence was sufficient to support the first degree murder conviction. The issue concerning admissibility of the defendant's statement is waived by the defendant's failure to include the suppression hearing in the appellate record. We conclude that the remaining issues were properly decided by the trial court, and we, therefore, affirm the conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and JOE G. RILEY, JJ., joined.

Bill Anderson and James V. Ball, Memphis, Tennessee, for the appellant, Geraldrick Jones.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Katrina U. Early and James M. Lammey, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Statement of Facts

### Guilt Phase of Trial

Kathaleen Champion, the mother of the victim, Natosha Hampton, testified that she last saw her daughter alive on May 28, 1998, at their shared residence in Memphis. The victim left at

approximately 7:00 to 7:30 p.m. with her friend, Michelle Caery, whom the victim referred to as her aunt. Ms. Champion stated that the victim worked at the Dixie Boys and Girls Club and at Sycamore View Nursing Home. She said the victim had an unknown amount of money in her purse, but Ms. Champion had repaid the victim $140 that day, for a previously existing debt. Ms. Champion warned her daughter that the purse she was carrying allowed someone to easily take the money out of the top. The warning was unheeded, and the victim took the purse. The victim had a car payment due the following day in an amount Ms. Champion recalled as being between $200 to $300. Ms. Champion described the victim's attire as black Guess jeans, a black shirt, and a black sheer blouse on top. The next time Ms. Champion saw the victim was at the funeral home where she viewed the body.

Michelle Caery testified that she had known the victim about twelve years, had a "pretty close" relationship with the victim, and referred to her as a niece. Ms. Caery had known the defendant, Geraldrick Jones, since January of 1998. She had introduced the victim and defendant about one and one-half months before their first date on May 28, 1998. Ms. Caery had picked up the victim and taken her to the defendant's home on Meda Street. Ms. Caery said the defendant was not at home when they first arrived, but came ten to fifteen minutes later. Ms. Caery and her boyfriend left but had planned to have breakfast at the defendant's home the following morning. Ms. Caery arrived there at 9:30 or 10:00 a.m. on May 29, without knowledge of the intervening events. Ms. Caery testified she had never observed the victim use drugs or alcohol. She said the victim had her purse when she last saw her, and the victim had expressed her intention to return to her home that night.

Kevin Ward had known the defendant for eight or nine years and was his roommate and close friend. In their shared residence, there was one bedroom which was used by the defendant. Mr. Ward slept in the living room on a long couch. Ward recalled that on May 28, 1998, the victim came to the defendant's residence with Michelle Caery. He said no one else was present but, at Caery's request, he paged the defendant, who arrived fifteen to twenty minutes later at approximately 10:00 p.m. The two couples left, but the defendant and victim returned with food. Ward and the defendant drank whiskey and smoked marijuana while watching television. The victim did not participate in the marijuana smoking or drinking of whiskey.

The defendant signaled Ward to leave, and he went to a house next door, occupied by two older men. While there, Ward and one of his companions drank the remainder of the whiskey. Ward returned to the defendant's residence after about two hours and was met at the door by the defendant. Ward and the defendant ingested cocaine. The defendant asked Ward to go and get more cocaine. Ward returned about 3:00 a.m. and heard laughing and giggling from the defendant's bedroom. The defendant came back to the living room, and he and Ward ingested more cocaine.

At approximately 4:00 a.m., the defendant returned to the bedroom, and Ward went to sleep. Ward woke to the sound of screams coming from the bedroom. Upon Ward's entry, he saw the defendant striking the victim in the head with a five-pound weight. Ward asked the defendant what he was doing, and the defendant replied that the victim had tried to steal his money. Ward asked if

the defendant had recovered the money, and the defendant said yes. Ward then told the defendant to let the victim go, and the defendant responded that he could not as it would violate his probation. The defendant kept hitting the victim, and Ward pulled him away. The victim then pushed both the defendant and Ward into the living room where Ward fell on the couch. Ward saw blood on the bed, on the walls, and on the defendant. From the couch, Ward rolled onto the floor while the defendant was on top of the victim, striking her with his fist. Ward pulled the defendant off of the victim, who attempted an escape down a hallway leading to the kitchen. The defendant caught the victim in the hallway and began striking her with the weight again. Ward estimated the defendant had struck the victim with the weight more than five times while in the bedroom and "several" more times in the hallway. The victim appeared unconscious to Ward as she lay half in the bathroom and half in the hallway. Ward described a pool of blood near the victim and could tell she was bleeding from the head. Ward also saw blood on the defendant's chest, abdomen, arms, and hands. Ward stated that the defendant threw down the weight and obtained a knife from the kitchen.

Ward stated the defendant said he was going to cut the victim up and wanted Ward's assistance. When the defendant turned toward the victim, Ward grabbed his shoes, ran to a nearby service station, and called the police. Ward did not go back into the house that morning. Ward stated that the victim was clothed in black pants and a black thin shirt with possibly a black bra.

On cross-examination, Ward stated that the victim was bigger than the defendant. He recounted that the defendant dropped the weight when the victim pushed him from the bedroom. After Ward grabbed the defendant a second time, the victim attempted to run through the hallway but was grabbed by the defendant, and the defendant began striking the victim with the weight again. Ward estimated that he and the defendant drank a pint of Crown Royal and had shared five or six marijuana joints and about two and one-half grams of cocaine. Ward admitted he was drunk and high and also believed the defendant was as well.

Ward acknowledged that he gave a statement to Officer A.J. Christian of the Memphis Police Department on May 29, 1998. He did not mention a bread knife being in the defendant's possession in that five-page statement. Neither did he make mention of the violation of the defendant's probation statement. Ward also failed to mention the defendant's probation during his preliminary hearing testimony. Also, during that testimony, Ward denied seeing any other weapon. Ward said that he thought the questioner was referring to a gun. Ward admitted that he did not know if the victim was unconscious or dead at the time she lay in the hallway and restroom. Ward did hear the defendant say, "I believe she dead." Ward said the defendant made this statement before the defendant got the knife. On redirect, Ward stated the victim was trying to cover herself from the defendant's blows. He did not see the defendant cut the victim with the knife.

Officer Dennis Norman of the Memphis Police Department was the next witness called by the State. On May 29, 1998, he was working as a uniform patrol officer on the midnight shift. A few minutes before 7:00 a.m., Norman received a dispatcher's report of a killing at 1224 Meda Street. He drove to the address and knocked on the front door without any response. He was then joined by his patrol partner, Officer Johnson. Together they attempted to look in the windows and

knocked on the door several times over a period of fifteen to twenty minutes. By looking in a kitchen window, Norman saw the victim's leg in the hallway.

The front door was forced open, and the two officers entered. Officer Norman immediately saw the defendant face down on his stomach with his eyes closed. He could also observe the victim lying face up in the hallway. Norman described her as partially naked, with her throat severely cut, and also with her arm cut to the bone at the shoulder. The paramedics followed the officers in the house and began checking the defendant. Norman observed the defendant had blood on his torso, chest, sides, and ribs. The defendant stated that he opened his door in response to a knock and was knocked unconscious. The defendant was taken to the hospital due to his injury claim. The defendant was wearing only boxer shorts. While the defendant was on the gurney, Norman noticed blood on the soles of the defendant's feet with leaves and dirt. After the defendant's release from the hospital, Norman transported him to 201 Poplar for questioning. Norman was asked if the defendant appeared to be under the influence of alcohol or drugs. Norman said that he did not smell alcohol, that the defendant's eyes were pretty clear, and that the defendant's speech was understandable. Norman did not believe the defendant was under the influence. On cross-examination, Norman confirmed that the dispatcher reported a call from a person who said their roommate had killed a person, and the caller then ran from the scene.

Shan Tracy, a Memphis police officer in the crime scene unit, was next to testify. He was sent to 1224 Meda Street on the morning of May 29, 1998, and prepared a sketch of the area. Tracy described where blood appeared and the location of the victim in the hallway. In the bathroom, he saw a large black-handled knife with a serrated edge. A white sheet was in the bathtub. In the toilet were a bloody pair of men's boxer shorts and a blue-handled mop. In the kitchen he saw blood smears on the range, the floor, and the door, and a package of trash bags on the floor.

In the bedroom, Officer Tracy observed a box fan just inside the doorway and, next to it, a circular five-pound weight. Bloody bed linens were on a chair and bloodstains were on the bed and on the one sheet still on the bed. On a table next to the bed were a purse and a cordless phone. On a dresser were a man's hat and a quantity of crack cocaine. There was no money found in the purse. A large trash can was in the hallway. On the outside in the back porch area was a green garbage can that contained a broken mop, a pair of loop earrings, a gold necklace, a black pair of jeans, a broken fingernail, a white t-shirt, multi-colored panties, and two green floor mats.

On cross-examination, Officer Tracy, by referring to the evidence log, stated that crack cocaine found in the bedroom weighed .9 grams and was found in the hatband on the hat on the dresser. There was $218 found in a drawer of the dresser. Marijuana, weighing 2.6 grams, was found in the living room. There was $2.10 and the victim's Tennessee drivers' license found in the black Guess jeans located in the outside garbage can. Also found in the residence was a Winchester twelve gauge Model 1300 shotgun and seven slugs.

Sergeant Sammie Ballard of the Memphis Police Department stated he was assigned to the Homicide Bureau at the time of this incident. Ballard and Officer Scott Ledford went to the hospital

where the defendant had been taken.  Ballard first administered the defendant's Miranda rights and had the defendant sign an acknowledgment.  The defendant made an initial statement that he had been knocked out while answering his door at about 4:00 a.m. and was then taken to the hospital. Ballard said the defendant seemed to comprehend the process.

Later in the afternoon, the defendant gave another statement after again being advised of his Miranda rights.  This statement was typed and signed by the defendant.  In that statement the defendant gave an account of the events as follows.  The victim was at the defendant's home when he arrived at 9:00 or 9:30 the previous night.  Kevin Ward and the victim's friend, Michelle, were with the victim, and Michelle left thirty minutes later.  The defendant and the victim left to attend a movie, but it was closed and they bought food and returned to the defendant's home about 11:30 p.m.  The defendant and Ward drank Crown Royal, and the victim drank cognac.  Marijuana was smoked.  About one hour later, the defendant asked Ward to leave and, after Ward's exit, the defendant and the victim watched television and engaged in petting.  Ward returned in an hour, and he and the defendant snorted cocaine in the bedroom.  The defendant and victim then went to the bedroom and had sex, and the victim fell asleep.  The defendant went into the living room, he and Ward took more cocaine, and he returned to the bedroom.  The defendant wanted to engage in more sex, and the victim resisted, which resulting in arguing.  The defendant hit the victim, and they fought, with him striking her several times with his fist in the face and head.  She tried to escape, and he struck her head with the weight.  The victim fell to the floor of the hallway, and the defendant struck her again with the weight.  The defendant got a long knife from the kitchen and stabbed the victim in the neck.  Ward was standing in the living room/hallway door, telling the defendant not to kill the victim.  The defendant told Ward to help him get rid of the body because she was dead.  The defendant attempted to take the victim into the bathroom and put her body in the tub so he could clean up the blood.  The defendant could not lift the victim into the tub.  He heard the front door slam and supposed that Ward had left to call the police.  After locking the front door, the defendant retrieved the knife in order to cut off the arms and legs of the victim and dispose of them in the garbage.  After being unsuccessful at severing the bone of the victim's right arm, he decided to place the body into a garbage bag and then into a can to remove from the house.  The defendant got the victim's clothes from the bedroom, removed her panties, placed them in a garbage bag, and placed it in a large city cart on the outside.  Upon seeing the police come by, the defendant stuck the mop in the toilet and hid behind the front door.  The defendant contrived a plan to say that someone broke in and knocked him out.  In answer to specific questions, the defendant stated he stabbed the victim once, struck her with the weight twice, and struck her with his fists several times.  This was his first date with the victim.  The defendant said he and the victim fought in the doorway of the bedroom, and she fell against the end of the couch, but was not on the couch.  The defendant said he was both drunk and high, but had not blacked out, and clearly recalled the details recounted.  The defendant said he suffered no injury during the incident.

On May 31, the defendant made corrections to his previous statement.  The defendant said he caught the victim attempting to steal his money from his dresser drawer, and an argument ensued. The defendant struck the victim and continued to beat her.  The defendant claimed the source of his money was from his mother and from cutting yards and selling of a few drugs.

On cross-examination, Ballard testified that the defendant seemed physically and mentally capable of giving a statement on the first occasion they talked. Prior to taking the written statement, Ballard was aware of Ward's allegation that he had seen the defendant beat the victim and ask Ward for help in disposing of the body. Ballard told the defendant of Ward's statement prior to the typewritten statement taken from the defendant.

Next, Dr. O. C. Smith, the Shelby County Medical Examiner, testified and was accepted as an expert on pathology. Dr. Smith performed an autopsy on the victim on May 29-30, 1998. He testified that the victim died of multiple injuries. He described the injuries as blunt trauma to the head, compressive force to the neck, and sharp force to the neck. In addition, the victim suffered defensive wounds to the arms and hands. Dr. Smith stated the five-pound weight could have caused the blunt trauma to the head. The sharp force wounds to the neck were not stab wounds, but a series of multiple incisions resulting in a long, wide, and deep wound. According to Dr. Smith, the knife found at the scene could have caused the neck wound. He described finding petechial hemorrhages, small red areas in the whites of the eyes, that indicate asphyxial-type deaths.

The neck incisions cut through the victim's wind pipe, esophagus, jugular vein on both sides, carotid artery on the right side, and into the front surface of the spine. He opined that there were nine blows to the victim's head. Dr. Smith also testified that he believed the victim was alive when her neck was cut, due to the existence of a heartbeat that caused bleeding into the cut tissues and the blood breathed into her lungs. The presence of sharp force wounds to the hands and fingernails indicated to Dr. Smith that defensive wounds occurred during life. The sharp force neck wound could cause death within one to two minutes.

Dr. Smith testified there were seven separate incisions at the right shoulder and armpit and believed the wound was inflicted after death. No evidence of alcohol or drugs was detected from tests performed on the victim. The doctor's opinion was that the victim experienced physical abuse beyond that necessary to produce death. He also observed that the large amount of blood on the couch in the living room near the hallway door was more blood than would have resulted from the blunt trauma and scalp lacerations alone.

On cross-examination, Dr. Smith stated the victim was five feet, seven inches tall and weighed 166 pounds. He stated that the blows to the victim's head were sufficient to cause death. While it is possible the head blows could cause unconsciousness, he could not determine that if unconsciousness did result. If the blows were the primary reason for death, then unconsciousness would precede death. He also stated that a lay person might believe an unconscious person was dead by the outward appearances. Dr. Smith agreed that the incisions to the victim's neck could have been an attempt to sever the head. The defensive wounds described on the victim's fingernails and hands could have been received while the victim's hands were at her throat, but the doctor agreed he could not say, to a medical certainty, that the hands had to be in that position. The fingernails on the victim were her natural nails, and there was no evidence of applied nails or remnants. The fake fingernail found at the scene could not be linked to any of her natural fingernails. Dr. Smith stated the petechial hemorrhages to the eyes were not the result of the neck incision, but of compression

by an undiscovered source. On redirect examination, Dr. Smith clarified that strangulation can occur without leaving a neck mark, and in this case, the neck tissues were disrupted by the incision wounds.

Based on the above facts, the jury returned a verdict of guilt as to first degree murder.

## Penalty Phase of Trial

Paulette Sutton, a forensic scientist, was accepted as an expert in the field of bloodstain pattern analysis. She testified that when she visited the crime scene on May 29, 1998, her first act was to make a cursory tour of the premises. She explained that she uses the area of least amount of blood spatter as one method of determining a starting point. In the bedroom, she pointed out bloodstains that indicated an origination from the area of the bed headboard. The stains were medium velocity, consistent with beating or stabbing-type of activity. The next area of stains indicated an origin near the foot of the bed. The stains found near the bedroom doorway indicated to Ms. Sutton that a standing individual received a blow in that area. She stated there was a passive pool of blood on two of the cushions of the couch in the living room. No large blood pool was found in the living room floor or bedroom. A blood trail was present on the end arm of the couch, but none in the floor in front of the couch. Ms. Sutton found a large amount of diluted blood in the hallway and bathroom. Due to cleanup efforts, she could not establish a definitive sequence by blood spatter pattern past the living room. In the bathroom, Ms. Sutton found diluted bloodstains on the floor and on the bathtub edge consistent with beating or stabbing-type activity. She testified she found the knife in the bathroom floor, and it had been placed on top of bloodstains on the floor.

Ms. Sutton said that from her analysis of the bloodstains, the events began in the bedroom and proceeded to the living room. Due to dilution from the cleanup effort, she could not follow the sequence further. She did find an indication of blow or stab activity in the bathroom. The largest pool of blood was found on the couch cushions of the living room. The witness said this was consistent with the victim's neck being cut on the couch. Ms. Sutton did not find an indication of an "arterial gush" anywhere within the house. In explaining the blood on the victim's face, Ms. Sutton said it was undiluted bloodstain transferred by a pliable substance consistent with the couch cushions.

On cross-examination, Ms. Sutton agreed there had been a diligent cleanup effort, but no evidence of any in the living room. The witness could not find blood evidence of the victim's body being dragged on the floor.

Doctor Steven Symes is a forensic anthropologist who works with the Medical Examiner's Office. His testimony related his examination of the victim's skull, cervical vertebra, and right upper arm. He described finding a stain or scuff mark on the skull. Associated with point of impact was a circumferential fracture on the external side but did not show up internally.

The cervical vertebra he examined contained a defect on the front side, which was a horizontal cut mark. Under magnification, he stated the cut was v-shaped with striations indicative of a serrated knife. In examining the bone of the right arm, he was able to count thirteen grooves, some superficial and some deep. He estimated it would take "several minutes" to inflict these cuts.

Ms. Kathaleen Champion, mother of the victim, presented victim impact testimony. She described the twenty-one-year-old victim as an outgoing person, loved by those who knew her. She spoke of the victim's employment and plans for advancement. The victim lived with her mother and a nineteen-year-old brother. Ms. Champion described the void left by the victim's death. She also said that she and the victim relied on each other financially, and the death had also impacted her in that respect.

A stipulation was entered that the defendant had been previously convicted of robbery and aggravated assault.

Mr. Prince Edward Jones, the defendant's father, testified for the defendant. The witness stated he and the defendant's mother had not lived together since 1984 and were divorced. In reference to the death of the victim, Mr. Jones said it came as a surprise to him, and this was not characteristic of the defendant. He said that the defendant was always "mannerable and respectful," and the witness never knew the defendant to be in trouble like that. Mr. Jones was not aware before this incident that the defendant dealt in selling drugs. The witness apologized for his son's actions and asked that the defendant's life be spared. On cross-examination, Mr. Jones claimed he was pretty close to his son but was unaware of the defendant's 1994 conviction for selling drugs. Mr. Jones also did not know of the defendant's convictions for assault, robbery, and aggravated assault.

Kaffranda Mason was next to testify for the defendant. She stated the defendant is the father of her four-year-old daughter. She stated she had caused the defendant to be arrested before, and he pled guilty to assault. She stated the defendant never struck her on that occasion. She said that the defendant had provided support for their child.

Telska Pollard testified she had dated the defendant for ten years, and they had been married for two years. They had two children, a ten-year-old son and an eight-year-old daughter. The defendant had provided support for the children. Ms. Pollard testified she had caused the defendant to be arrested once, but she had not pursued the matter and did not remember if the defendant was convicted. She stated that she cooperated with the defendant in keeping his father from knowing of the defendant's convictions. On cross-examination, it was revealed that on the occasion of her bringing charges against the defendant, they had fought and he had hit her with a bar used to lock the steering wheel of an automobile.

Barry Jordan, the defendant's uncle, testified next. He recalled that the defendant, when younger, had a temper and was picked on by others due to his small size. The witness was shocked at the murder charge and had thought the defendant had improved in managing his temper.

Vanessa Dale Luellen, the defendant's mother, testified that she was a recovering drug addict and had been drug-free for eleven years. From 1985 through 1991, she was on drugs. She described how her drug use adversely affected the defendant and that the defendant had dropped out of school in the tenth grade and tried to support her other children. She concluded by taking responsibility for the results of her past addiction and its affect on the defendant. She pled for the defendant's life to be spared.

The defendant testified in his own behalf. He stated he was twenty-eight years old and had children that he supported before his incarceration. He admitted killing the victim and said he had been using drugs and alcohol. He stated that he snapped when he caught the victim going into his money drawer. He apologized to the victim's mother and asked the jury to spare his life. During cross-examination, he stated that he had not learned from his previous sentence on aggravated assault and robbery convictions. He testified he did not remember cutting the victim's neck or why he did not stop. He stated he was high on drugs. He could not remember telling his roommate that the defendant had to kill the victim due to the defendant's probation status.

## Analysis

We first examine the defendant's contention that the evidence was insufficient to support a finding of first degree murder. The defendant argues that his ingestion of alcohol, cocaine, and marijuana, combined with his discovery of attempted theft by the victim established, at most, proof of second degree murder.

When an accused challenges the sufficiency of the evidence, this Court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Brewer, 932 S.W.2d 1, 18 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this Court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this Court is required to afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003).

The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence. Id. In State v. Grace, the Tennessee Supreme Court stated, "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d 474, 476 (Tenn. 1973).

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.

At the time of this killing, first degree murder was defined, in pertinent part as:
(1) A premeditated and intentional killing of another;
. . . .
    (d) As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(a)(1) and (d) (1995). "Intentional" is defined in Tennessee Code Annotated section 39-11-106(a)(18) (1997) as "conscious objective or desire to . . . cause the result."

The elements of premeditation and intent are questions for the jury. The jury may analyze the circumstances surrounding the killing in reaching a determination. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

After reviewing the proof in the light most favorable to the State, as we are required, we agree that the evidence is sufficient to convict the defendant of premeditated first degree murder. The defendant began his assault on the victim in the bedroom using a five-pound weight to strike the victim's head. The defendant's attack persisted in spite of his roommate's attempted intervention and efforts to pull the defendant away from the victim. Despite pleas from the defendant's roommate to let the victim go, the defendant frustrated the victim's attempt to escape and continued his brutal assault. The defendant further told his roommate that he could not release the victim due to his probationary status, from which the jury could infer his intent to kill. After apparently rendering the victim unconscious, the defendant obtained a large knife and incised a deep wound to the victim's neck. The medical examiner attributed the victim's death to multiple injuries.

The jury heard and rejected the defendant's claim of diminished capacity due to voluntary intoxication. The evidence in this record supports the jury's finding that the defendant acted without passion and, consciously, with premeditation, engaged in the conduct which caused the victim's death. The issue is without merit.

The defendant next contends that the trial court erred by its failure to suppress two statements given by the defendant. In support of this , the defendant argues the statements were not freely and voluntarily given due to his ingestion of alcohol and drugs in the hours preceding the statements.

The technical record indicates that a suppression hearing was held and that the defendant's motions to suppress were denied. However, the defendant has failed to include the transcript of the suppression hearing in the record before us. This issue is waived pursuant to Tennessee Rule of Appellate Procedure 24(b). It is the duty of the accused to provide a record which conveys a fair, accurate, and complete account of what transpired with regard to the issues which form the basis of the appeal. Tenn. R. App. P. 24(b); see State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999).

The defendant's next issue deals with certain photographs admitted during the guilt and penalty phases of the trial. The defendant's argument is grounded in Tennessee Rules of Evidence Rule 401 as to relevance, and Rule 403 contending that the probative value was substantially outweighed by the danger of unfair prejudice. We note initially that the defendant's brief has failed to make reference to the specific exhibit numbers to which objection was made. However, we will address the photographs that are readily capable of identification.

In reviewing the admissibility of photographs, we must first determine if the photographs were relevant. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. See State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978) (citations omitted). Accordingly, "the admissibility of photographs lies within the discretion of the trial court" whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." Id. Notwithstanding, a photograph must be found relevant to an issue at trial with its probative value outweighing any prejudicial effect before it may be admitted into evidence. See State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998). Photographs of a corpse are generally admissible in murder prosecutions if they are relevant to the issues at trial. Banks, 564 S.W.2d at 950-51; see Tenn. R. Evid. 403. Notwithstanding this broad interpretation of admissibility, evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. Banks, 564 S.W.2d at 951.

The defendant objects to Exhibit 12, a picture of the defendant's upper body which showed encrusted blood in various places on the defendant's upper body, as well as a tattoo of a skull with a smoking cigarette. The defendant describes the tattoo as "violent" and alleges that it has no probative value. The testimony at trial produced evidence of a very bloody scene. Exhibit 12 was relevant to show the defendant's participation, as well as the issues of intent and premeditation. It is not unfairly prejudicial and was properly admitted.

The photographs next asserted as unduly prejudicial are of the garbage can with the victim's body next to it in the hallway of the defendant's home. Exhibits 20 and 21 both show a blue garbage can with a body partially visible. We presume these to be the object of the defendant's objection on appeal. Exhibit 20 depicts a hallway scene showing copious blood smears on a door, the facing, and the floor. Only the victim's unmarked left arm is visible next to a bloodstained garbage can. Though

bloody, the photograph is not gruesome and advanced the State's theory of a continuing attack relating to intent and premeditation. Exhibit 21 shows the interior of the garbage can seen in Exhibit 20 which contains pooled blood. Only a portion of the victim's unmarked body is visible. Though arguably non-essential, this photograph is not, in the context of the trial, gruesome. The trial court reviewed both pictures upon the defendant's objection at trial and found them probative of the defendant's culpable mental state in attempting to dispose of the body. The exhibits were properly admitted.

The defendant next cites as an issue the following: "The court erred in allowing in certain photos as evidence during the testimony of Dr. O. C. Smith, depicting prejudicial views of the deceased. The defendant contends that these pictures, objected to at trial, were extremely graphic and that their prejudicial value was not outweighed by the probative value."

The photographs introduced through Dr. Smith were Exhibit 3, a picture of the victim's face taken at the autopsy; and Exhibits 36 and 37. The latter two exhibits were each large boards containing a number of photographs of each exhibit. Exhibits 36 and 37 were retained by the trial court clerk, unless requested by this Court. We assume the defendant refers to Exhibits 36 and 37 as being overly prejudicial in proportion to their probative value.

The trial court conducted an extensive voir dire of Dr. Smith prior to his testimony, and each picture was examined and weighed appropriately by the applicable rules of evidence. The trial court sustained the defendant's objection in part and removed five of the pictures. Viewing the evidence in this case in its entirety, we are compelled to note the overwhelming evidence in the record that establishes the defendant's guilt. We do not believe a review of these exhibits would serve to change that conclusion. We accept the trial court's careful analysis of the subject exhibits and find the issue without merit.

The defendant's brief states its next issue as follows:
The court erred in admitting certain photos, objected by defense counsel during the penalty stage of the trial, that depicted graphic scenes of the residence where the murder took place and graphic scenes of the victim herself. The defendant contends that these pictures' probative value was far outweighed by the prejudicial value.

Initially, we note that there were 42 photographs admitted during the sentencing stage. Thirty-seven of these were introduced through Ms. Sutton, the blood spatter pattern expert. Although the defendant's brief does not specify the exhibit numbers, the record shows the defendant objected to thirteen of the exhibits. The trial court conducted a jury-out hearing and examined each proposed exhibit individually. Ultimately, all were admitted after an appropriate weighing of their probative value versus their prejudicial impact. The State introduced five photographs of the victim's bones through Dr. Symes, the forensic anthropologist.

Our review of these photographs leads us to conclude that some are prejudicial, but not unduly so, in light of the State's obligation to prove the murder was heinous, atrocious, or cruel. The

introduction of pictures for this purpose has been repeatedly upheld.  See State v. Hall, 976 S.W.2d 121, 161 (Tenn. 1998).  We conclude that there was no abuse of discretion in admitting the subject photographs at the sentencing phase.

The defendant next generally avers that evidence of other crimes was improperly admitted through the defendant's father on cross-examination.  The defendant's father testified for the defendant during the sentencing phase that the events of this case did not fit with the son he knew. The witness described the defendant as always "mannerable" and respectful, and the witness was not aware the defendant was dealing in drugs.  The witness concluded his direct testimony by saying the defendant is "not that type of person" and something was wrong with him at the time.  On cross-examination, the witness claimed that he was close to his son and that the defendant was not the type of person to commit murder.

The witness was then asked if he was aware the defendant had been convicted for selling drugs.  The trial court gave a limiting instruction as to the use of the defendant's misdemeanor assault and explained it could only be used for impeachment.  The witness was then questioned as to his awareness of three other convictions of the defendant's, respectively; assault, robbery, and aggravated assault.  The robbery and aggravated assault convictions had been previously stipulated.

Our standard of review when determining whether evidence of other crimes has been improperly admitted is whether the trial judge abused his discretion.  State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997).  In this case, we conclude he did not.  All the convictions were utilized to rebut the witness' claim of closeness with the defendant and his ability to judge the defendant's character.  The trial court's limiting instruction explained the use of the misdemeanor conviction. The admission of the convictions in rebuttal of the witness's assertions did not constitute an abuse of discretion.

## Conclusion

After careful consideration of the defendant's contentions, we conclude that the defendant's allegations as to sufficiency of the evidence and errors occurring during the guilt and penalty phases of the trial are without merit.  Accordingly, we affirm the convictions.

_____
JOHN EVERETT WILLIAMS, JUDGE